UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/9/2024

UNITED STATES OF AMERICA,

              -v-

JAMES KELLY,

                             Defendant.

1:23-cr-113-GHW

MEMORANDUM
OPINION & ORDER

------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Defendant James Kelly is charged with the commission of a gunpoint robbery of a deli in the Bronx. Over the life of the case, Mr. Kelly asked for the Court to appoint him new counsel four times. The Court complied. In all, the Court appointed seven different members of the Court's Criminal Justice Act ("CJA") panel to represent him. As trial approached, Mr. Kelly was represented by two experienced members of the CJA panel. During a pre-trial conference on the Thursday afternoon before a Monday trial, Mr. Kelly asked to change counsel for a fifth time. Because of the timing of the request, and because the Court found that any breakdown in Mr. Kelly's relationship with his counsel was attributable to Mr. Kelly, the Court denied the request in a ruling from the bench. This opinion expands on the basis for that decision.

## I.     BACKGROUND

### A.     Indictment

James Kelly was named as a defendant in a complaint that asserted that he had engaged in a Hobbs Act robbery on or about January 15, 2023 and that he had brandished a firearm during the commission of the crime. Dkt. No. 1. A warrant was issued for Mr. Kelly's arrest on February 2, 2023. Dkt. No. 2. Mr. Kelly had his initial appearance in the case before Magistrate Judge Willis.

Dkt. No. 4.  Donna Newman, a lawyer from the Court's Criminal Justice Act ("CJA") panel, was

appointed to represent Mr. Kelly.  *Id.*  Judge Willis ordered that Mr. Kelly be released on bail.  *Id.*

      The Government appealed Judge Willis's bail ruling to District Judge Paul G. Gardephe,

who was then presiding over Part I.  Dkt. No. 5.  Judge Gardephe heard the Government's appeal

on February 7, 2023 and reversed Judge Willis's decision, ordering that the defendant remain in

custody pending trial.  Dkt. No. 8.

      On March 1, 2023, the grand jury returned a two-count indictment against Mr. Kelly,

charging him with Hobbs Act robbery in violation of 18 U.S.C. §§ 1951 and 2 and the use and

brandishing of a firearm in connection with that offense in violation of 18 U.S.C. §§ 924(a)(1)(A)(i),

(ii), and 2.  Dkt. No. 9.  The case was assigned to me.

### B.       Mr. Kelly's Many Prior Requests for New Counsel

      The next day, March 2, 2023, Mr. Kelly's counsel, Ms. Newman, wrote to the Court to

explain that Mr. Kelly had requested the appointment of a different lawyer to represent him.  She

wrote:

> At the last two communications I had with Mr. Kelly he advised he wanted a
> different counsel assigned to represent him.  He insisted that I inform the Court of
> his desire.  My attempt to reconcile with him any difference in case strategy have
> proved futile.  Accordingly, I agree new counsel should be appoint[ed] at the
> arraignment of Mr. Kelly.  At this early juncture of the case, I do believe it would be
> best if new counsel was appointed now before the case proceeds further.

Dkt. No. 10.  The Court scheduled a hearing for the following week to discuss the defendant's

request.  Dkt. No. 11.

      On March 8, 2023, the Court held the hearing.  The Court invited Jacqueline Cistaro, the

CJA lawyer on duty for the day, to attend the hearing as well.  March 8, 2023 Transcript ("March

Tr.") at 3:16–4:5.  The Court reminded Mr. Kelly of his right to remain silent and the attorney-client

privilege.  *Id.* at 4:13–6:3.  The Court then advised Mr. Kelly of the nature of his right to counsel

under the Sixth Amendment.  *Id.* at 6:4–22.  In addition, the Court told Mr. Kelly the following:

> Now, the Supreme Court of the United States said many times, however, in effect that defendants, for whom counsel are appointed, do not have the right to their choice of preferred counsel.  Nor are you guaranteed counsel with whom you have a rapport, or as another circuit court stated, a friendly and happy attorney-client relationship.  So you have the right to effective counsel, but you do not have the right to your preferred counsel.

*Id.* at 6:9–16.  The Court then asked Ms. Newman why Mr. Kelly was asking for new counsel.

> Ms. Newman responded as follows:

> Mr. Kelly has expressed a strong desire for change of counsel.  After the appeal, the government's appeal on the bail that we obtained from the magistrate, Judge Gardephe ruled to revoke the bail order and that Mr. Kelly remain detained until conclusion of the proceeding as ever they may come out.  So there was clearly something about that application and the proceedings that completely broke down the communication.

> Subsequent to that, basically, Mr. Kelly has refused to discuss anything, and has indicated to me in person plus on the phone in the presence of my investigator that the only thing he is willing to say to me is basically that he wants new counsel.  And because, your Honor, there is such a breakdown in communications which is certainly so odd at such an early stage of these proceedings, I believe, based on my experience, that it's wise to change counsel, and that that may give a better prospective to him as to this case and the evidence.

> So for that reason, I strongly urge the Court to change counsel, because he can start now with getting the discovery, discuss the discovery with another counsel.

*Id.* at 7:5–20.  Ms. Newman's explanation made clear that Mr. Kelly's motivation for seeking new counsel was that his displeasure at the judge's ruling—and counsel's inability to get him a better result.

The Court then addressed Mr. Kelly again at length.  The Court highlighted for Mr. Kelly that he was not entitled to change counsel as often as he liked, among other things.  A portion of that colloquy is quoted below:

> So, Mr. Kelly, just as an important note you are not permitted to change counsel in this matter as many times as you like.  It's also important, Mr. Kelly, for you to note that even if you do change counsel, there's no guarantee that new counsel will give you legal advice that's any different than the legal advice you receive from Ms. Newman. . . .  Ms. Newman does very good work.  You should also understand all of the lawyers who represent you, whether that's Ms. Newman, Ms. Cistaro, or any possible substitute counsel, have a duty of loyalty to you and your interests.  Your

> counsel has an ethical obligation to be loyal to your interests, and you should
> understand that as you're considering her advice and guidance.

*Id.* at 8:1–24.  The Court noted, however, that "these are very early days.  And as a result, the change of counsel will have a very limited impact on the schedule."  *Id.* at 8:25–9:1.

The Court then offered Mr. Kelly the opportunity to confer with Ms. Cistaro about the decision whether to change counsel; Mr. Kelly accepted that offer and conferred with Ms. Cistaro. *Id.* at 9:4–16.  After a "lengthy recess," during which Mr. Kelly conferred with Ms. Cistaro, Mr. Kelly confirmed that he had had an adequate opportunity to confer with her about the request.  *Id.* at 10:1–7.  The Court then asked the defendant if it was still his desire to change counsel.  After Mr. Kelly affirmed that it was, the Court appointed Ms. Cistaro as his counsel and relieved Ms. Newman. *Id.* at 10:14–11:25.  Mr. Kelly did not ask to speak directly to the Court during the course of the hearing about the reason for the requested change in counsel.

In ruling on the request, the Court emphasized that the procedural context for the request was important, and that Court might not grant a request on the same record at a later point in the case.  The Court stated the following:

> I should just note, it's not necessarily the case that I would grant a request of this
> nature even on the same facts at a later stage in the case.  Again, one of the
> considerations for the Court in considering an application to change counsel is the
> timeliness of the request for counsel.  So while I'm granting this request on the basis
> of the proffer by counsel now, part of the reason why I'm doing that is because it's
> very early days.  A similar set of concerns might not justify relieving counsel at a
> letter stage in the case.
>
> So, Mr. Kelly, I just remind you that you are not entitled to your choice of counsel,
> and you should not expect that I will necessarily appoint for you a third or fourth
> counsel in this case.

*Id.* at 10:24–11:10.  The Court arraigned Mr. Kelly and scheduled a status conference, which was pushed back to July 13, 2023 at the request of the defendant.  Dkt. No. 18.

On June 28, 2023, Ms. Cistaro wrote to the Court, informing it that Mr. Kelly again wanted new counsel: "Mr. Kelly has advised that he wishes to have new counsel appointed to represent him in this case." Dkt. No. 21. The Court scheduled a conference to discuss the application.

The conference to discuss Mr. Kelly's request to replace Ms. Cistaro took place on July 6, 2023. The Court invited the CJA lawyer on duty that day, Donald D. Duboulay, to attend the conference. The Court followed literally the same script as at the prior conference. The Court again advised Mr. Kelly of his rights and, again, told him that "If you wish to speak here, you may, but I advise you to confer with your counsel first to make sure that anything that you may wish to say to the Court is in your best interest." July 6, 2023 Transcript ("July Tr.") at 5:11–13.

The Court repeated its explanation of the defendant's rights under the Sixth Amendment, almost entirely verbatim, as provided at the prior change of counsel hearing. *Id.* at 5:14–6:6. In the course of that discussion, the Court repeated its cautionary note that while the defendant was entitled to the effective assistance of counsel, "defendants for whom counsel are appointed, however, do not have a right to their choice of preferred counsel . . . ." *Id.* at 5:20–21. The Court then reviewed the procedural history of the case. *Id.* at 6:7–12 ("In this case, Ms. Cistaro is the second appointed counsel. You asked previously for me to replace her predecessor. I did that very early in the history of the case. We do not yet have a trial schedule. But this is, again, the second request by Mr. Kelly to change counsel in the course of about the last three or so months.").

Ms. Cistaro then explained the reasons for the request. She told the Court that the reason for the request was Mr. Kelly's disagreement with her on case strategy.

> Your Honor, I believe Mr. Kelly and I have a difference of opinion, specifically concerning case strategy, and he has expressed his displeasure with me as his attorney and requested that I ask the Court for new counsel to be appointed. I don't think that we could go forward in an attorney-client relationship at this point.

*Id.* at 6:23–7:3. The Court asked Ms. Cistaro more questions about the reason for the request: she confirmed that she had visited with the defendant and had communicated with him by email, and

that she had been able to discuss the substance of the case with him.  When the Court asked

Ms. Cistaro for "a sense of the nature of the breakdown in communications that leads to this

request," Ms. Cistaro again noted that the issue was driven by a difference in opinion about the

substance of her advice:  "I believe we have a difference of opinion concerning how to go forward

in certain aspects of the case, and I don't believe that Mr. Kelly is going to change his mind, and it's

my professional and legal opinion[]."  *Id.* at 8:4–9.

      As in the prior conference, the Court reminded Mr. Kelly of the limitations on his ability to

change counsel:

> Mr. Kelly, I believe I said this to you before.  I am going to emphasize it again here
> now.  You are not permitted to change counsel in this case as many times as you like.
> As I think I also said earlier, an important thing for you to be aware of is that even if
> you change counsel, there is no guarantee that your now counsel will give you any
> legal advice that's any different than what you have heard from Ms. Cistaro.

*Id.* at 8:15–22.  The Court reminded Mr. Kelly that the timing of the request was an important factor

in the Court's considerations:  "If I do appoint new counsel for you here today, my expectation is

that we will promptly reconvene and set a trial date in the case.  We do not yet have a trial or motion

schedule established.  That, as you heard me say before, is a factor for me to consider when I'm

evaluating the request."  *Id.* at 10:7–11.

      The Court then gave Mr. Kelly the opportunity to confer with Mr. Duboulay about the

reasons for his request to change counsel.  Mr. Kelly expressed an interest in raising an issue.

Because Ms. Cistaro was not aware of the nature of the issue, the Court invited Mr. Kelly to discuss

the issue with counsel during a break, as well as the request for a change in counsel.  *Id.* at 13:13–18

("I want to give you the chance to talk with the very capable lawyers who are here about both of

those things and whether or not you want to raise the second set of issues, that is, the ones that

Ms. Cistaro doesn't know about, before the Court decides about whether or not to let you change

your counsel.").  After having the opportunity to confer with counsel, Mr. Kelly told the Court that

he still wished to change counsel.  *Id.* at 16:2–9.

Having observed Mr. Kelly's hostile interactions with Ms. Cistaro during the course of the

conference, the Court concluded that a change of counsel was appropriate.  *Id.* at 16:17–21 ("Here,

in light of the information that I have received from Ms. Cistaro today *and based on my own personal*

*observations of the interactions between the defendant and Ms. Cistaro*, I am going to grant Mr. Kelly's request

for new counsel." (emphasis added)).  After doing so, the Court told Mr. Kelly:  "Mr. Kelly, I just

want to remind you again, however, that you are not entitled to your choice of counsel and that you

should not expect that I will appoint a third lawyer for you."  *Id.* at 16:22–24.  The Court appointed

Mr. Duboulay as Mr. Kelly's counsel.

Shortly after being appointed, Mr. Duboulay reported that Mr. Kelly wished to make a

statement to the Court.  Mr. Duboulay advised Mr. Kelly against making a statement, "[b]ut he

wants to make a statement."  *Id.* at 20:3–5.  The Court provided Mr. Kelly another reminder about

the risks of speaking to the Court directly.  *Id.* at 20:8–21:15.  Mr. Kelly chose to address the Court.

His comments about his substantive concern are reproduced in full below.[1]  The Court told

Mr. Kelly that his counsel could best discuss the substance of Mr. Kelly's issues with him.  *See, e.g.*,

*id.* at 23:7–11 ("So I have heard the question.  Your counsel has and so has the lawyer for the

government.  My hope is that counsel will be able to talk about those issues so that your lawyer can

explain to you his best answer to your question.  Thank you for raising it here.").  The Court

---

[1] THE DEFENDANT:  This is James Kelly.  My issue that I want to raise with the courts is what I don't understand and what I wasn't explained by two most recent attorneys that were appointed to me.  My main question is, I am being charged with one charge, with what I was told here by you and by my attorneys prior, of Hobbs Act robbery.  I want to know, why do I have two of my dismissed cases that are a civil lawsuit in my discovery, and that's all the information that's in my discovery, and the case that I'm here for now is dismissed the day that I was brought here.
THE COURT:  I'm sorry.  When you say the case was dismissed, what are you referring to?
THE DEFENDANT:  Two cases that the government are saying that are uncharged and I'm being investigated for are currently dismissed cases and in civil lawsuit, and they are currently now in my discovery.  The case that I'm before you today for, for the last six months, was dismissed the day that I was brought into the building.  I don't understand anything after that.

scheduled another conference for July 27, 2023 to give Mr. Duboulay time to familiarize himself with the case before setting a schedule for motion practice and a trial.

On July 26, 2023, the day before the next conference, the Court received a letter from Mr. Duboulay: "I write to inform the Court that Mr. Kelly has notified me that I have been fired, and that he will be requesting the appointment of another attorney to represent him going forward. That request will be made at tomorrow's conference." Dkt. No. 24.

As with Mr. Kelly's prior two requests for a change of counsel, the Court invited the duty CJA lawyer, David S. Greenfield, to attend the conference. The Court again followed the same script for the conference with Mr. Kelly—notwithstanding the fact that it involved the repetition of advice provided to Mr. Kelly twice before. July 27, 2023 Transcript ("July 27 Tr.") at 6:4–5 ("I apologize. You've heard this before, but I think it is worthy of repetition."). The Court again advised Mr. Kelly of certain of his rights, and the scope of his right to counsel, including the fact that "defendants for whom counsel are appointed do not have the right to preferred counsel." *Id.* at 6:6–8:7. The Court again reviewed the procedural history of the application. *Id.* at 8:15–23.

The Court then asked Mr. Duboulay for an explanation for the reason for the request that Mr. Kelly be permitted to change counsel. He explained that Mr. Kelly had treated him with hostility during both of his visits and did not engage with him substantively.[2] Mr. Duboulay did not

---

[2] MR. DUBOULAY: I met with him on two occasions. So the first occasion I had not yet received the discovery, so I wanted to introduce myself, introduced myself to him, and just find out what was on his mind. I was aware of the history of the case. The reception was actually pretty hostile. In fact, I was fired at that occasion. But we came around towards the end of it, and we left I think at better terms.

I met with him a few days ago. Our meeting was fleeting and brief. Again, it was a pretty hostile environment. At the end of the meeting, Mr. Kelly came out into the attorney visiting room and made a big show of firing me to the officers, pointing his finger at me. . . .

I'm not sure why, but it looks like there is just an antagonistic situation there, and I don't think anybody should subject themselves to the disrespect that he occasionally shows. And that's all I can come up with. That's the only thing I can explain.

believe that he could represent Mr. Kelly as a result.  The Court turned back to Mr. Kelly, and, as it

had twice before, the Court reminded Mr. Kelly of the limitations on his ability to change counsel:

> you don't have the right to your preferred counsel.  And you're not permitted to
> change counsel in the case as many times as you'd like.  As I said earlier, if you do
> change counsel, there is no guarantee that new counsel will give you legal advice
> that's any different from the advice, if any, that you've received from Mr. Duboulay.
> It sounds as though you didn't get to the point here where you had that opportunity.

*Id.* at 10:21–11:3.

At that point, Mr. Kelly broke in to complain about Mr. Duboulay's comments.  *Id.* at 11:4–

15 ("Excuse me, your Honor.  I don't mean to be disrespectful or anything, but I can't take the lies

that this guy is just sitting here doing.  And if I have an outbreak, it will be me being disrespectful or

rude.  I am not that kind of guy at all.  So can I have a breather in the back or something?

Because . . . .  This is totally impossible.  I'm getting no -- counsel obviously not doing their job, and

are making up things.  I don't do allegations or make up lies.  So can I have breather for myself,

please.").  The Court granted Mr. Kelly his requested breather, and asked that he speak with

Mr. Greenfield after he had collected himself.  Mr. Kelly conferred with Mr. Greenfield.

The Court then repeated the substance of its prior comments to Mr. Kelly—reminding him

again that "you don't have the opportunity to change counsel as many times as you would like."  *Id.*

at 15:15–16.  The Court informed Mr. Kelly that while it had not been able to set a schedule for the

case given the prior changes in counsel, "I just want to highlight . . . that I do want to put in place

some deadlines for us to move forward with the cases, and I hope to do that soon, because that will

help bring the charges against you to a conclusion efficiently and timely."  *Id.* at 15:18–21.

When the Court asked Mr. Kelly if he wanted to change counsel, his response was

unexpected; he said that he was not, and never had requested a new lawyer:

> Sir, I never asked or put in a request for any change of counsel.  I'm waiting to be
> represented by counsel fairly.  And nothing legally has been done forward by any
> counsel I've been appointed to.  And every time I come to court, it is the change of
> counsel.  I'm not making any request to change counsels.

*Id.* at 16:2–7.  This ran contrary to Mr. Kelly's assertions at the prior conferences that he wanted to

change counsel.  So the Court asked Mr. Kelly if he wanted to speak with Mr. Duboulay.  He

declined; instead Mr. Kelly again addressed the Court, stating in part:

> I keep being here for change of counsel.  I wanted to be treated fairly and the
> process to be done right, and cannot just answer you your question about appointing
> a new counsel with still the same problem.  No discovery, he told you earlier he had
> the discovery and the guy never brought me discovery.  Period. . . .  I am not here to
> pick and choose any lawyer you give me.  I'll take any lawyer you give me.  But
> nothing is being done legally moving process forward with the case whatsoever.
> Nothing pertaining to the case from the lawyer's conversations to me when they
> come.

*Id.* at 18:11–16.

The Court responded, noting that counsel had said that Mr. Kelly had fired him and that he

had acted in a hostile manner toward him, and that he could not work with him.  As a result, the

Court appointed Mr. Greenfield as Mr. Kelly's counsel.  After doing so, again the Court reminded

Mr. Kelly that he was not entitled to his choice of counsel, that any counsel had a duty of loyalty to

him and to his interests and encouraged Mr. Kelly to try to work productively with his new counsel.

Then the Court set a motion and trial schedule.

The Court told Mr. Kelly that the trial date was firm—subject to a single contingency:  a

conflicting trial on Mr. Greenfield's schedule.  The Court established an alternate date in the event

that Mr. Greenfield's other case was not resolved before trial.  The Court advised Mr. Kelly that "if

any circumstances arise and you want or need to change counsel, it's absolutely crucial that you raise

that as soon as possible. . . .  Again, I'm not suggesting that you should or will.  I just say this

because if you wait until just before the trial date, I may not grant your application, and you may be

left with a choice of proceeding with your existing counsel . . . ."  *Id.* at 32:12–25.

On August 16, 2023, Mr. Greenfield wrote to request an adjournment of the trial date

because he expected that his conflicting trial was going to proceed.  Dkt. No. 33.  In the letter, he

notified the Court that "twice, on August 3 and August 14, 2023, I have attempted to see Mr. Kelly

at MDC-Brooklyn.  Both times Mr. Kelly refused the visit and I did not meet with him."  *Id.*  The

following day, the Court scheduled a conference to discuss the scheduling issues and to establish a

new trial date.  The conference took place on August 23, 2023.  During the conference, the Court

reminded Mr. Kelly that if he had a request to change counsel for any reason, that it would be in his

interest to do so

> as early as possible.  If you were to wait until just before the trial date, I might not
> grant your application or you might be left with the choice of proceeding with your
> present counsel or I might grant your application and your new lawyer would have to
> go to trial with you on the new date just with less time to prepare.

Dkt. No. 38 at 5:2–15.

Responding to the assertion that Mr. Kelly had declined to meet with Mr. Greenfield, the

Court encouraged counsel to discuss the process for meeting with Mr. Kelly going forward.  And

the Court encouraged Mr. Kelly to take advantage of the opportunity to discuss the case with his

counsel:  "I believe that it would be in your best interest[] to take advantage of the fact that you have

counsel here."  *Id.* at 8:9–10.[3]

A week later, Mr. Greenfield wrote the Court again:

> Since my appointment on July 27, 2023, Mr. Kelly has refused to meet with me.  At
> the conclusion of the last status conference before Your Honor, on August 23, 2023,
> Mr. Kelly informed me that I was fired.  I scheduled a legal call for yesterday hoping
> to speak with Mr. Kelly.  When Mr. Kelly got on the phone, he told me I was fired
> and terminated the conversation.
>
> Accordingly, I respectfully request that the Court hold a change of counsel hearing.

Dkt. No. 35.  The Court scheduled the hearing for the following week—September 7, 2023.

For the September 7, 2023 conference, the Court arranged for CJA counsel to be present:

Michael Bradley appeared at the conference.  The September 7 proceeding followed the same script

---

[3] During a court appearance with Mr. Greenfield, Mr. Kelly was seated in the jury box, rather than adjacent to counsel because of concerns about counsel's safety.

as the prior conferences.  The Court provided an overview of its agenda.  September 7, 2023 Transcript ("September Tr.") at 2:20–3:3.  The Court explained that, after walking Mr. Kelly through his rights, it expected to "ask Mr. Greenfield some questions about the grounds for the request that he be relieved, and in particular to help me understand why it is that Mr. Kelly has told him that he was fired."  *Id.* at 2:23–3:1.  The Court again advised Mr. Kelly of his rights, among them, his rights to effective assistance of counsel.  The Court then reviewed the procedural history of the application—reminding the defendant that, as the Court had previously advised him, the trial date was firm and that further changes in counsel would not result in a delay of the trial date.  *Id.* at 7:13–8:3.

The Court then asked Mr. Greenfield if he could explain the basis for Mr. Kelly's request to change counsel.  Mr. Greenfield responded:  "Judge, in your question, you asked me if I can explain the rationale – not in a million years."  *Id.* at 8:17–18.  Mr. Greenfield, however, laid out the chronology of his interactions with Mr. Kelly.  As part of that narrative, Mr. Greenfield explained that he had twice gone to the jail to meet with Mr. Kelly over the course of two weeks.  In both instances, Mr. Kelly refused to leave his cell to meet with Mr. Greenfield.  *Id.* at 8:21–9:21.  So Mr. Greenfield next had the opportunity to see Mr. Kelly in person at a conference in Court, "and Mr. Kelly refused to talk to me in the courtroom after we had our proceeding and, in fact, in open court, fired me any number of times.  I never had a substantive conversation with him during the course of the, quote-unquote, firing."  *Id.* at 10:23–10:2.[4]  Mr. Greenfield did not give up; he made another effort and called Mr. Kelly:  "when he was brought to the phone, he asked me why I was even calling because he fired me the day before or a few days before and then he hung up the phone."  *Id.* at 10:3–8.

---

[4] No reference to this conversation between Mr. Greenfield and Mr. Kelly appears in the transcript of the proceeding. The Court does not recall it.  As a result, the Court understands that Mr. Greenfield is referring to a conversation that took place following the hearing in the courtroom after the Court stepped down from the bench.

The Court looked for further explanation for Mr. Kelly's request: "I do want to see if I can understand this a little bit better. I understand that, counsel, you don't know what has driven Mr. Kelly's decision-making here. Nor do I. It would be helpful for me to know what the reason is for the, I'll call it[,] communication breakdown." *Id.* at 10:13–17. The Court asked Mr. Kelly if he would like to discuss the issue with Mr. Bradley, the duty CJA attorney. Mr. Kelly responded, somewhat inscrutably: "I can't answer that, your Honor. The issue hasn't been addressed." *Id.* at 11:21–22. The Court appointed Mr. Bradley to confer with Mr. Kelly about Mr. Kelly's desire to change counsel. Before the recess to permit Mr. Kelly to speak with Mr. Bradley, the Court reminded Mr. Kelly that trial on the charge was going to take place as scheduled and that "as you've heard me say before, that you're not entitled to change . . . counsel in this case as many times as you would like." *Id.* at 12:20–13:3.

While the Court made those and other remarks, Mr. Kelly raised his hand. The Court responded to tell Mr. Kelly that it would be "happy to hear anything that you'd like to say, Mr. Kelly, but my preference would be that you focus any communications with the Court through your counsel." *Id.* at 13:16–19. The Court asked if the issue was something that could wait until after Mr. Kelly had conferred with Mr. Bradley. Mr. Kelly responded that "It actually doesn't have anything to do with counsel." *Id.* at 13:22–25. The Court demurred to permit Mr. Kelly to discuss the issue with counsel before speaking in open court.

After the break, Mr. Bradley was able to report on the reasons for Mr. Kelly's feelings about Mr. Greenfield. Mr. Bradley explained that Mr. Kelly believed that Mr. Greenfield did not have "his best interests at heart in the representation" because of the change of the earlier change in trial date from November 27, 2023 to January 29, 2024. *Id.* at 15:8–14. Mr. Kelly "felt as though he wasn't consulted about that and that the reason for that Court date change was not adequately explained to him." *Id.* at 15:10–13. In response, the Court pointed out that the two dates had been set at the

13

same time (with Mr. Kelly present) because of the possibility that Mr. Greenfield might not be available for the earlier date.  Mr. Bradley explained that Mr. Kelly had only refused Mr. Greenfield's visit at the MDC once because he did not want to see him—the other time, Mr. Bradley clarified, was because Mr. Kelly "was not feeling well."  *Id.* at 16:10–25.  Mr. Kelly also felt that Mr. Greenfield "was not doing his job with respect to filing motions in the case."  *Id.* at 17:23–25. The Court observed "that in accordance with the pretrial scheduling order issued by the Court, no motions by defendant have yet been due.  They're not due for another month."  *Id.* at 18:21–23.

After more reminders to Mr. Kelly that "you're not entitled to your choice of counsel, that the deadlines in the case aren't going to change even if I do appoint new counsel," the Court asked if Mr. Kelly still wanted the Court to appoint new counsel.  *Id.* at 19:20–24.  Mr. Kelly responded that he did.  As it had on the occasion of Mr. Kelly's prior requests for counsel, the Court laid out the factors that it was required to consider, "including the timeliness of a defendant's request for new counsel, the adequacy of my inquiry regarding the nature of the underlying issue, whether or not the conflict resulted in a total lack of communication, and whether the defendant's own conduct contributed to the communication breakdown."  *Id.* at 20:7–14.

The Court granted Mr. Kelly's request, but emphasized the marginal nature of the request and that the Court's decision was heavily influenced by the fact that there remained substantial time before trial.  The Court's analysis from the record is laid out below:

> Many of these factors do not weigh very heavily in favor of a change in counsel.  It appears that Mr. Kelly's conduct contributed substantially to the communication breakdown here as I understand it.  The principal genesis for it is a misunderstanding regarding the basis for the change in trial date, which is an issue that we discussed in open court on the record in his presence twice.  So, after that, Mr. Kelly did not discuss the issue with his counsel or otherwise take the opportunity to formulate an understanding of why it was that the request was made.  So there seems to have been a lack of understanding about what was happening in the court, which happens, but I think that Mr. Kelly's own conduct contributed to this communication breakdown because rather than exploring an understanding of the issue through further communications with his counsel, Mr. Kelly did not communicate about it.  Instead, he just shut down communications with his counsel.  So, I think that Mr. Kelly's

14

conduct contributed to the communication breakdown here.  That's a factor that weighs against a change in counsel.

The effect of Mr. Kelly's decision here is that he and Mr. Greenfield have not been able to communicate at all about the presentation of his defense.  That's a factor that weighs in favor of a change of counsel.

The request for new counsel was made relatively promptly following the appointment of Mr. Greenfield, which weighs in favor of a change of counsel.

And the principal reason, factor that weighs in favor of me granting this request now is that, still, trial is sufficiently far out for incoming counsel to adequately prepare for trial.

So I'm going to grant Mr. Kelly's request for a change in counsel, but my comment is that the factors weigh very marginally in favor of a grant of this request.  The same set of facts later in the case, closer to trial might not, one should not expect, they would lead the Court to conclude that another change of counsel was warranted here.

So I just want to be very clear, Mr. Kelly, that you are not entitled to your choice of counsel.  As I said earlier, the Constitution entitles you to conflict-free competent representation, but it doesn't entitle you to your choice of preferred counsel.  Moreover, as I've said previously, I'm not changing the date of trial.  The trial date is not changing.

*Id.* at 20:16–22:8.  The Court appointed Mr. Bradley to represent Mr. Kelly going forward.

On November 30, 2023, the case was reassigned to the Honorable Dale E. Ho for trial. Judge Ho appointed Mr. Kelly a second lawyer to represent him in the case as it ramped up for trial—Sabrina Shroff.  Dkt. No. 64.  Judge Ho granted Mr. Kelly a second lawyer notwithstanding the fact that the charges in the case were discrete—a single alleged gunpoint robbery of a deli.  On January 4, 2024, the Government filed a superseding indictment adding an additional charge of Hobbs Act robbery.

Unforeseen circumstances led to the reassignment of the case from Judge Ho back to me on February 28, 2024.  Perhaps not unsurprisingly, the first piece of correspondence addressed to me was a request to substitute counsel—Ms. Shroff asked to be replaced as counsel as a result of scheduling conflict, and offered Donald Yannella as a replacement.  Dkt. No. 101.

### C.   Mr. Kelly Requests New Counsel Again on the Eve of Trial

In the week following the reassignment of this case to me, the Court worked to resolve a series of pending motions in the case—including several motions in limine, a motion to suppress, and a *Daubert* motion. The schedule for briefing those motions had been established by Judge Ho— and they were all fully briefed as of March 6, 2024. On March 7, 2024, the Court held a *Daubert* hearing and then ruled from the bench regarding many of the pending motions. The Court ruled against Mr. Kelly with respect to all of them. Then the Court heard final comments on the proposed voir dire questions, as the conference wound down.

Then Mr. Kelly asked for the attention of the Court. March 7, 2024 Transcript ("March 7 Tr.") at 118:24. Mr. Kelly was again advised of his rights, and the Court gave Mr. Kelly the opportunity to confer with his counsel before addressing the Court. His counsel reported back: "We have had an opportunity to consult with Mr. Kelly, and he would rather express what he wants to say to the Court rather than have defense counsel say it for him." *Id.* at 121:22–25. After a further colloquy to inform him of the potential downsides of addressing the Court directly, Mr. Kelly said this:

> My name is James Kelly, defendant. I would like to raise serious issues with -- I would like for my attorneys to be relieved, especially Michael Bradley specifically, for numerous reasons that I wouldn't even want to go into detail unless I was asked what those are about. But for numerous reasons, my interest, he doesn't have my interest at best here. Numerous things. Everything pertaining to around this case I am just [finding] out today as we go along, and that's unacceptable to me. It's been the case, but I am addressing it now. So I cannot move forward being represented by Mr. Bradley.

*Id.* at 123:10–20.

Given that the hearing began at 10:00 a.m. and that Mr. Kelly had raised his concern at approximately 1:45 p.m., the Court proposed a recess for lunch and to give Mr. Kelly the opportunity to confer with counsel. Mr. Kelly objected to that proposal, offering the following remarks:

> My application is sustained.  I cannot move forward with these two or Mr. Bradley
> still representing me.  It's going to be a waste of time to have me go sit in the cell
> and come back here and resume.  I don't mean to be any kind of a-hole, or whatever
> you want to call it, but this is very sensitive.  Every other time you relieved the
> counsel, you never wanted to know what was my reason or anything.  I had three
> trial dates before today; we never made none of them.  I didn't stop those things
> from happening.  And now today I am being faulted -- not even being faulted.  Now
> it's inquiry on why I am requesting a leave of absence.  That was the problem in the
> first five attorneys I had before today. . . .  I am sustained on my answer.  I cannot
> move forward with these attorneys.

*Id.* at 124:18–125:7.  Nonetheless, the Court gave the parties a lunch break before returning to engage further with Mr. Kelly's request.

After the break, the Court requested feedback from the parties regarding the procedure that the Court should adopt in order to respond to the request.  The Government offered that it was willing to leave the courtroom for any *ex parte* communications with Mr. Kelly about the basis for the request.  But it objected to the substance of the request, noting that "this would be his fifth set of lawyers, seven lawyers total appointed to him in connection with this case . . . ."  *Id..* at 128:12–129:19.  Counsel for Mr. Kelly agreed that any colloquy with Mr. Kelly should take place *ex parte* and also suggested that the Court invite the CJA counsel on duty to come to the courtroom to confer with Mr. Kelly.  130:20–131:19.  The Court did so, and invited Mr. Nooter, the CJA counsel on duty to confer with Mr. Kelly.  Following the same basic script as it had in the prior change of counsel proceedings, over the course of four pages of the transcript the Court advised Mr. Kelly of his rights, including his right to counsel, and reviewed the procedural history of the case, noting the number of lawyers that had been appointed to represent Mr. Kelly in the case.

At that point, Mr. Kelly interjected with the following comment:

> Your Honor, I have nothing to do with what you are just saying.  It's hard for me to
> decipher.  Are you talking to me or telling me something?  Now that I understand
> what you are saying, I didn't relieve Ms. Shroff or any of those things.

*Id.* at 137:15–19.  The Court explained to Mr. Kelly that it was addressing him and that it would repeat its prior comments:  "I am going to repeat things that I've already said to you in the past.  Do

you understand what I'm saying to you, Mr. Kelly?"  *Id.* at 138:2–4.  Mr. Kelly responded in a petulant tone:  "No.  I don't understand."  *Id.* at 138:5.

The Court began to repeat its prior guidance.  During the Court's remarks, however, Mr. Kelly's attention appeared to stray, and the Court repeated Mr. Kelly's name to draw his attention.  Mr. Kelly interrupted the Court's remarks, speaking loudly:  "I don't even know those people.  I don't know none of counsel you gave me.  It's unfortunate.  I don't understand."  *Id.* at 138:24–139:1.  The Court continued, "I'm sorry.  Mr. Kelly, just bear with me for a moment.  So I don't know what's happening here Mr. Kelly . . . ."  *Id.* at 139:2–3.  Mr. Kelly interjected:  "I don't give a f**k about that."  *Id.* at 139:5.

The Court appointed Mr. Nooter to speak with Mr. Kelly, but after a recess, Mr. Nooter reported that he "wasn't able to clarify exactly what he wants to do other than that he is still seeking to change counsel."  *Id.* at 142:3–7.  Because the Court was unable to discern the basis for the defendant's request from the information provided to it to that point, the Court excused the Government and engaged in an *ex parte* conference with Mr. Kelly and his counsel.

### D.     The *Ex Parte* Conference

The Court engaged in an extended *ex parte* conference with Mr. Kelly and his counsel.  That portion of the conference lasted over half an hour and spans twenty-six pages of the transcript.  In their introductory comments, counsel for the defendant expressed that Mr. Kelly wanted to be able to speak directly to the Court.  They acknowledged the issues with Mr. Kelly addressing the Court and noted that they had advised him regarding the concerns.  In describing the potential concerns, counsel revealed that Mr. Kelly had been responding to the Court's oral opinion earlier during the conference:  "As your Honor was reading the decision into the record before, Mr. Kelly was speaking in ways that . . . which deal with the merits of the case."  *Id.* at 144:10–12.  The Court then handed the floor to Mr. Kelly:

So, Mr. Kelly, you have the opportunity to address the Court. Again, just for the sake of clarity here, Mr. Kelly, what I want to understand is why you want to change counsel and so that's the principal thing that I'm looking to hear from you about now. Tell me what you want to change counsel. And with that, the floor is yours, Mr. Kelly.

*Id.* at 145:20–25.

Rather than addressing the question, Mr. Kelly began by focusing on what appeared to be a grievance by Mr. Kelly that the Court granted his prior requests without asking for him to speak to the Court. Here's how Mr. Kelly responded to the Court's question:

THE DEFENDANT: If I understand you correctly, your Honor, you would like for me to explain why I would like to change counsel.

THE COURT: Yes.

THE DEFENDANT: My fifth time, not the other four times, correct?

THE COURT: I'm sorry?

THE DEFENDANT: You would like me now to explain on the fifth time why would I want counsel to be changed but not the other times.

THE COURT: Yes.

THE DEFENDANT: I mean, I'm trying to -- I just don't stand how to speak on this issue, on the fifth issue and not the other four when there was no concern, never wanted to know what was my explanation or reason for any other change of counsel before. And now it's at a critical time. I believe the first time that I asked for a change of counsel was critical to me, what the reasons and what it was for. It was never addressed by you. You just made and appointed to me a new counsel. Now it's the fifth time it's looking as if I'm making an inconvenience to my own freedom, possible freedom in the Court's procedure here. That's not the case.

So I don't mean to say the word "so," but I just didn't understand why it was never addressed before and now it's being a problem that you want sufficient enough reason supporting my reason of change of counsel on the fifth time and not the first time, second time, the third time or the fourth time, or even up to recently of the relief of Ms. Shroff.

It was never addressed why or what was going on and why that person left or nothing. So if I'm understanding clearly, I'm being almost forced to explain now on the fifth time when the decision hasn't even been made if I will get the new counsel or not and nearer the other four times this never took place here. *This is not about my unhappiness. So I will clear that up. It's not about defendant James Kelly's unhappiness with*

*counsel. That's not the issue.* And I'll reiterate again that this is the fifth time that there's been an alleged issue but only the first time that I'm being asked what may be the reason.

*Id.* at 146:13–147:15 (emphasis added).

Because Mr. Kelly said that the issue was not the result of his unhappiness with counsel, the

Court asked why he wanted to change counsel.

> THE COURT:  Thank you.  You say that not about your unhappiness with counsel and you say that this is not an alleged issue.  Is there an issue that leads you to want to change counsel now?
>
> THE DEFENDANT:  Of course, sir.  This is an issue with this fifth counsel, yes, as there were the last four issues.
>
> THE COURT:  Thank you.  And what's the reason why you are looking to change counsel now?
>
> THE DEFENDANT:  I don't think that I can process the words that I was going to make my issue and enough reasoning.  So I don't know how to word -- I don't know you would like me to word it but --
>
> THE COURT:  You can say it however you like, Mr. Kelly.  I am not going to tell you how to say it.  Just tell me what you are thinking.
>
> THE DEFENDANT:  I'm sorry.  I can't do that.  It would involve, I would think it would involve whatever I allege or facts or what's true or it's just basically all going to be an allegation if I even go into detail or they run into the case, yes, I don't understand how not to withhold some information by trying to get my point across. I'm not experienced in that area.

*Id.* at 147:16–148:12.  From this, the Court understood that whatever the issue was it was something

that had continued from the time of his prior counsel ("as there were the last four issues").  And Mr.

Kelly was unable or unwilling to articulate a reason for his discontent.

The Court asked Mr. Kelly if he had been able to communicate with his counsel, and he

responded that "most recently yes."  *Id.* at 149:2–3.  The Court inquired if there was "some

limitation in your ability to communicate with your counsel about your defense?"  *Id.* at 149:11–12.

Mr. Kelly responded:

THE DEFENDANT:  That right there may be the issue, defense, period.  From the beginning of times.

THE COURT:  Thank you.  I'm sorry.  I don't know what that means.

THE DEFENDANT:  So the beginning times, meaning every prior counsel before there's a issue of defense.

THE COURT:  Thank you.  What do you mean?  I'm really focused again on the request to change counsel now.

THE DEFENDANT:  Your Honor, I don't know how to – now I would just be saying things.  I don't understand nothing past what I already said.  That's what I can accumulate to try to explain to you.  I don't understand nothing past what I already said.  For the reiteration, I don't know how to do that.  You looking for a specific answer I'm not aware of.

THE COURT:  Thank you.  I just want to understand from you, Mr. Kelly, why you want to change counsel.  Tell me in your own words why you want to change counsel now.

THE DEFENDANT:  I wanted to tell you, your Honor, why I wanted to change counsel four times ago when it was critical.  So now I don't know what's the difference now.

THE COURT:  Thank you.  What is it that leads you now to want to change counsel?

THE DEFENDANT:  Okay.  I think I assessed it right.  What leads me to want to change counsel now is from the beginning of appointed counsel with the handling of my case with the defense, the communication skill part taking with the defense on my behalf, skill set, technique, advice.  There's no, hasn't been no communication all other four times also, including this time.  That's only being addressed now.  So this is an ongoing problem.

*Id.* at 149:13–150:20.  The Court's inquiry continued across several more pages of the transcript.  In his responses, Mr. Kelly expresses a lack of understanding ("I don't understand nothing") and what the Court perceived as paranoia, and continued perceived grievances regarding the fact that the Court had previously granted his requests for new counsel.  The Court asked several times if he wanted to provide additional information.  "I have nothing to say, your Honor. . . .  I rest my reason on that right there."  *Id.* at 152:18–20.

But when the Court asked again if there was anything else that Mr. Kelly wanted to share about why he did not want to proceed with his lawyers, he provided a more substantive response. The response made clear that he was unhappy with the outcome of the Court's rulings on his motions. The Court believed that Mr. Kelly was expressing that the defendant's loss proved that his counsel was doing their job poorly. For example, Mr. Kelly said the following:

> But you could you say numerous times on the record how I failed to do anything. I don't write no letters to you. I don't do the motions. So I know that whatever is done is done in act of concert of me and supposed to be backing up of what I'm saying from the lawyers or whatever my standpoint or defense is with this case. But just to add also confirming from what you say. You said I failed to do a lot of things of backing myself up about the case or address this issue, that issue, this issue, that issue. I know I'm being represented by counsel. So I'm being confirmed that counsel that I have been having obviously been doing they job if you sit there and say for the record I failed to do something to backup any allegations or what not, what have you. *If I'm being a little bit more clearer, I think I am. That's just my little backing up on something I heard you say that confirms everything.*

*Id.* at 153:10–25. To the Court, this set of comments made clear that Mr. Kelly was bothered by the outcome of the motion practice. And it also indicated a degree of paranoia—the Court understood that what he believed to have been confirmed was that his counsel was not doing proper work for him—which was not the import of the Court's prior rulings on the parties' motions practice.

The Court then directly engaged with counsel, inquiring, among other things, about the number of times that they had visited Mr. Kelly. *Id.* at 154:23–155:3. They confirmed that they had visited him numerous times in the MDC. They also told the Court that he had not agreed to meet with them on some occasions, and that they had been told by jail officials that Mr. Kelly had refused the visits. *Id.* at 155:5–20.

Counsel asserted that there had been a breakdown in their communication with Mr. Kelly. But they timed that breakdown from the time of the Court's adverse rulings on the pending motions. *Id.* at 157:8–10 ("You know he hasn't been willing to engage with me since, your Honor – well, since before the break I'll say."). The Court discussed the breakdown in counsel's

communications with Mr. Kelly for more time.  Counsel commented that Mr. Kelly had accused them of working with the Government:  "There have been times where Mr. Kelly has expressed the opinion that I may be working with the government for some reason."  *Id.* at 156:1–3.

Later in the conference, the Court turned to Mr. Kelly to respond to some of his comments. When the Court addressed Mr. Kelly, he had his head down facing the table and was not looking up. The Court said "Mr. Kelly, I'm talking to you.  Are you listening[?]"  *Id.* at 159:1.  The Court's use of Mr. Kelly's name provoked a lengthy eruption from the defendant complaining about the Court's use of his name, which the Court believed to be untethered to reality, as the Court noted on the record.  *Id.* at 163:4–8.  The Court responded to some of the grievances that Mr. Kelly had articulated during his remarks, including his "comments earlier about the fact that I had not asked you for why it was that you wanted a change of counsel in the previous iterations."  *Id.* at 164:10–12. The Court noted that "You don't remember this, but I know that I told you that the reasons that will support a request for a change of counsel change depend[ing] on the circumstances.  So that is the case.  And I say that because your shaking your head and saying no, I don't think that."  *Id.* at 164:12–16.  Mr. Kelly then said, "I never heard that."  *Id.* at 164:17.  Of course, as detailed earlier in this opinion, the defendant had heard that many times.

Mr. Kelly interrupted a later explanation by the Court with another remark that the Court perceived as paranoid:  "You're insinuating something.  I am totally sitting here quietly listening to you.  What am I doing wrong.  Can you cuff my hand or something?"  *Id.* at 165:1–3.  Defense counsel provided further feedback about their views of the process and the impact of the communication breakdown on their ability to represent the defendant.  The Court asked several additional times if there was additional information that the defense wished to present to the Court. They declined.

E.      The "Bottom Line" Decision

After the conclusion of the extended *ex parte* conference with the defendant and his counsel, counsel for the United States rejoined the conference.  It was almost 5:00 p.m.  Because the parties had been in the courtroom since 10:00 a.m., and the Court wanted to consider the issues presented, the Court proposed another conference the following morning.  The Government told the Court that it could appear.  But Mr. Kelly communicated through counsel that "he cannot come to court tomorrow because he has a religious -- he is a Muslim and he cannot come to court on Friday."  *Id.* at 171:24–172:2.  Mr. Kelly's counsel represented to the Court that Mr. Kelly said that there were religious services throughout the course of the entire day.  *Id.* at 172:7–22.  Given that asserted scheduling issue and the fact that trial was scheduled to begin the following Monday, the Court heard further argument and agreed with the Government's proposal that the Court should take a recess and then rule on Mr. Kelly's request.

After an extended recess, the Court issued a "bottom line" decision, denying Mr. Kelly's request for another change of counsel.

> I am going to give you now, just because of the fact that we have a time constraint, just, I will call it, the bottom line of my decision here.  I will provide you with some more of the detailed factual basis for the decision at a later date.
>
> The parties all know that there are several considerations for the Court in evaluating a motion for a substitution of counsel.  There are four things that should be considered:  The timeliness of the defendant's request for new counsel; the circuit evaluates the adequacy of the trial court's inquiry; we look to whether the conflict, if any, resulted in a total lack of communication; and whether the defendant's own conduct contributed to the communication breakdown.  Those factors are outlined in *United States v. Carreto*, 583 F.3d 152, 158 (2d Cir. 2009).  They were summarized there after the circuit adopted that four-factor test in *United States v. John Doe No. 1*, at 272 F.3d 116.
>
> I have considered all of those factors, which I again will provide more detail about in the future.  And in sum, I am going to deny the request to change counsel.  Again, I will provide you with more detail regarding the basis for this decision when we reconvene on Monday.  I will just say a couple of things now.  First, there is a trial scheduled for Monday.  The timing, therefore, of this request is very late.  Mr. Kelly may or may not remember this, but among the many comments made by the Court

at prior conferences was this: "So as I said before to Mr. Kelly——and again, I am not saying you would or should want to change counsel——I do want to simply note that if there were any requests to do so, it would behoove you to raise the issue as promptly as practicable. I say that because it is absolutely crucial that counsel have sufficient time to prepare for trial." I also said, "If you were to wait until just before the trial date, I might not grant your application or you might be left with a choice of proceeding with your present counsel, or I might grant your application and your new lawyer would have to go to trial with you on the new date with just less time to prepare."

So I will detail further in another ruling, I expect, more of the procedural history here. But the principal procedural history relates to the timing of the trial date, the timing of this request, namely, at 1:45 on the Thursday before a Monday trial date, and the fact that Mr. Kelly has benefited from seven, again, esteemed members of our CJA panel over the course of the [case]. I am not going to comment here in more detail regarding the justifications for the request. I expect that I will expand upon those separately. But here, I will just say that my review of those factors, after having provided the defense an opportunity to provide me with an ample record upon which to consider the request, leads me to conclude that there is not such a breakdown in communications, but that is not the responsibility of the defendant, such that granting the request would be appropriate. As a result, I am denying it.

*Id.* at 176:14–178:17.

The Court and the parties devoted the remainder of the conference to a discussion of evidentiary issues raised by the defense. The Court then adjourned the conference in anticipation of a Monday trial.

### F. Mr. Kelly Refuses to Appear for Trial

The following Monday morning, March 11, 2024, counsel and the Court appeared ready to begin the trial. Mr. Kelly, however, did not. The Court was informed by the U.S. Marshals Service that "he stated that he will not be forced to go to trial with his current attorney . . . ." March 11, 2024 Transcript ("March 11 Tr.") at 2:18–20. The Court and the parties worked together to determine how to address his absence.

Having had the opportunity to observe Mr. Kelly during the March 7, 2024 hearing, and having reviewed the transcripts of his prior appearances, the Court was concerned about the defendant's competence and raised the issue:

The one other thing that I want to just raise, having spent a good part of the weekend looking at the transcripts of our prior change of counsel proceedings and having lived through the one on Thursday, is the basic question of whether counsel believe that the defendant is competent to assist counsel in his defense.  No lawyer has suggested to me that that's an issue but I have been observing him and I don't know to what extent the issues that are resulting in these multiple changes in counsel may derive from some other kind of current concern that would fall into the set of issues related to the defendant's competency to assist his counsel at trial.

I just raise that question for the parties to consider.  Again, I'm going to keep it in mind, no one has raised it in particular.  Counsel for defendant's choice not to raise it is strong evidence that it is not an issue but it is something that I have in mind and may want to address and would address with the feedback of the parties.

*Id.* at 14:17–15:8.

Later during the conference, counsel for defendant returned to the Court's remarks about the defendant's competence, and pointed the Court to a redacted submission that had been sent to Judge Ho on January 7, 2024.  *Id.* at 25:21–26:4.  "The Court may not have received the unredacted version of that document which is why the Court, of course, is of the belief or holds the belief about the defense having not raised competency before . . . ."  *Id.*  I requested that the unredacted version of the letter be sent to me.

Later that day, having reviewed the letter, and having reviewed the transcripts of several of Mr. Kelly's conferences with the Court, the Court issued an order directing that Mr. Kelly's competency be evaluated.  Dkt. No. 116.  The competency assessment is ongoing now.  Trial has been adjourned *sine die.*

## II.      DISCUSSION

### A.      Legal Standard

"The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel."  *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001).  "This right to counsel includes a right to conflict-free representation."  *Id.* (quotation omitted).  "This right does not, however, guarantee a 'meaningful relationship' between the defendant and his counsel."  *Id.* (quoting

*Morris v. Slappy*, 461 U.S. 1, 13–14 (1983)).

Moreover, the Second Circuit

has stated that, once trial has begun, a defendant has no unbridled right to reject assigned counsel and demand another and that courts must impose restraints on the right to reassignment of counsel in order to avoid the defendant's manipulation of the right so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.

*Id.* (quotations omitted).

A district court's denial of a request to substitute counsel is reviewed for abuse of discretion.

*United States v. Carreto*, 583 F.3d 152, 158 (2d Cir. 2009).  In reviewing whether a trial court has

abused its discretion, the court of appeals considers the following factors:  "(1) the timeliness of

defendant's request for new counsel; (2) the adequacy of the trial court's inquiry into the matter; (3)

whether the conflict resulted in a total lack of communication between the defendant and his

attorney; and (4) whether the defendant's own conduct contributed to the communication

breakdown."  *Id.*

> **B.   Application**

> **1.   Timeliness**

Mr. Kelly's request was made very late.  He raised the issue at approximately 1:45 p.m. on

the Thursday before a trial scheduled to begin the following Monday morning.  The Court finds that

the request was provoked by the Court's adverse ruling on the defendant's motion.  As described

above, Mr. Kelly had previously requested a change of counsel when a bail determination came out

against him.  And during the Court's ruling on the defendant's motion, he was commenting on the

Court's decision to his counsel.  His lawyers explained that the breakdown in communication began

right after the Court issued its decision.  So the request was made late, and it was provoked by an

adverse ruling by the Court.

Mr. Kelly was advised many times by the Court that he did not have the opportunity to

change counsel as many times as he liked, and that one factor that the Court would consider in evaluating any request was its timeliness. The Court specifically advised Mr. Kelly that it might not grant a late request for a change of counsel. That he made the request so late, after the Court cautioned him so many times about the issue weighed heavily in the Court's conclusion that his request to change counsel should not be granted.

### 2. Extensive Inquiry

The Court engaged in a lengthy inquiry regarding the basis for Mr. Kelly's request for a change of counsel. As described above, that process included inquiry to Mr. Kelly's current counsel, a discussion with the CJA counsel on duty, who was asked to discuss the issue with Mr. Kelly, and an extended *ex parte* conference with Mr. Kelly and his counsel.

### 3. Nature of Breakdown In Communications

The breakdown in communications here is apparently the result of Mr. Kelly's perception of legal issues endemic to the case, and this particular request to change counsel was provoked by the Court's adverse rulings on pending motions. As described above, the climactic breakdown in communications between Mr. Kelly and Mr. Bradley began after the Court issued adverse rulings against him on October 7, 2024. During the *ex parte* conference with Mr. Kelly, he expressly stated that the issue was "not about defendant James Kelly's unhappiness with counsel. That's not the issue." Mr. Kelly also said that the issue was not something that had come up with respect to this set of counsel, but rather was an issue that had persisted from the beginning of the case: "That right there may be the issue, defense, period. From the beginning of times. . . . So the beginning times, meaning every prior counsel before there's a issue of defense." March 7 Tr. at 149:13–17. He never clearly articulated what that persistent issue was.

Mr. Kelly's comments also signaled that he was dissatisfied with the kind of work his counsel had done, and its results. As outlined above, Mr. Kelly described a reason for this most recent

request to change counsel as being "with the handling of my case with the defense, the communication skill part taking with the defense on my behalf, skill set, technique, advice."  He also spoke at length about the Court's adverse ruling on the defendant's position in motion practice.

From Mr. Kelly and his counsel's comments, as well as the prior interactions with Mr. Kelly, the Court understands that there is a breakdown in Mr. Kelly's ability to communicate with his counsel.  That breakdown is based not on conduct by counsel, but on Mr. Kelly's disagreement with, or disappointment in, the strategic guidance and advice provided by counsel.

### 4.  Cause of Breakdown in Communications

Mr. Kelly's conduct was the cause of the communication breakdown.  Mr. Kelly has worked his way through a large number of members of the Court's CJA panel.  In some instances, as with Mr. Greenfield, Mr. Kelly refused to talk with them entirely.  As detailed above, in more than one instance, Mr. Kelly acted in a hostile way that made it difficult for counsel to work with him. Mr. Kelly's repeated problems with experienced, well-credentialed members of the Court's CJA panel is powerful evidence that the cause of the breakdown that led to the current request is Mr. Kelly's conduct.

During the course of his colloquy with the Court during the conference on October 7, 2024, the Court found it challenging to communicate with Mr. Kelly.  He was inattentive.  He interrupted. He expressed unsupported grievances.  For example, as highlighted above, he spoke several times about his unhappiness that the Court had not asked him questions about his reasons for wanting to change counsel in prior proceedings.  That grievance was factually inaccurate, as Mr. Kelly did speak to the Court notwithstanding guidance from his counsel and the Court about the possible disadvantages of doing so when he asked to be permitted to do so.  And the grievance was arguably unwarranted, since in each case, the Court had granted Mr. Kelly the relief that he requested.

Mr. Kelly's conduct and comments demonstrated a lack of understanding by Mr. Kelly of

the substance of prior conferences.  For example, during the conference in which Mr. Greenfield was replaced with Mr. Bradley, Mr. Kelly complained about the change in trial date when the schedule and the reasons for it were discussed in his presence at a prior conference.  Mr. Kelly's comments to the Court during the *ex parte* portion of the October 7 conference showed the same tendencies:  as just a few illustrative examples, Mr. Kelly said that he did not know any of the prior counsel appointed for him, that he had not been told that the time for the request of a change of counsel was a factor in the Court's considerations for a replacement of counsel, and that he had not previously fired his counsel.  Mr. Kelly repeatedly stated that he did not understand what was happening in the proceeding.  All of this despite the fact that the Court had previously explained the issues to him multiple times.

On March 7, the Court did not know whether Mr. Kelly's conduct, purported failure to recall prior events and guidance, and purported lack of understanding were symptoms of a mental disorder that made him legally incompetent.  That issue will be resolved separately.  The Court did know, however, that the issues that Mr. Kelly had with his counsel were not their fault—they were caused by Mr. Kelly and his conduct.  As a result, balancing all of the relevant factors, the Court decided that Mr. Kelly's request for the substitution of counsel should be denied.

III.     CONCLUSION

The Court deeply appreciates the work of the members of the CJA panel, including Mr. Bradley and Mr. Yannella.  The Court understands the challenges that counsel have had working with Mr. Kelly, and that he has announced his unilateral intention not to work with them.  But at base, the Court understands that the issue is not unique to this set of CJA lawyers.  The issue that Mr. Kelly has with them has been an issue that has developed with all of his other prior CJA lawyers. The breakdown in communication is the fault of Mr. Kelly.  The Court does not believe that it will be solved by the appointment of yet another set of lawyers to represent him.  The Court hopes that

Mr. Kelly—should he be found competent—will choose to work with his counsel cooperatively and assist them in his defense.

For the reasons stated above, Mr. Kelly's application for the substitution of counsel has been DENIED.

SO ORDERED.

Dated: March 25, 2024
New York, New York

_____
GREGORY N. WOODS
United States District Judge